E-FILED
Tuesday, 18 April, 2017 03:36:03 PM
Clerk, U.S. District Court, ILCD

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:16-cr-40049-SLD-1 |
| JAMES P. COLEMAN, | ) ) ) |
| Defendant. | ) ) |

### ORDER

Before the Court is Defendant Coleman's motion to suppress evidence, ECF No. 13. For the following reasons, his motion is GRANTED.

### BACKGROUND[1]

In the early morning of Tuesday June 14, 2016, Phillip Pieper, a patrol officer with the Galesburg Police Department, was on patrol in his squad car in Galesburg, Illinois. At 1:16 a.m., Pieper received a radio dispatch that there had been a shots-fired call at 537 Phillips Street. The dispatch stated that a male was involved in the incident, but did not convey any further identifying information.[2] The dispatch also stated that the male in question was driving south on Phillips and west on Grove in a newer gold car. Pieper was about three blocks away.

To get to the location described in the dispatch, Pieper drove along Whitesboro Street, which is crossed by train tracks. A train was crossing Whitesboro Street, and stopped at the

---

[1] The findings of fact recounted here are derived from the evidence presented at the hearings held on January 25, 2017, and March 1, 2017, and from Coleman's sworn affidavit, ECF No. 16-1. *See* Fed. R. Crim. P. 12(b)(3)(C); *United States v. Stribling*, 94 F.3d 321, 323 (7th Cir. 1996) ("Because the resolution of a motion to suppress is necessarily fact-specific, we give special deference to the district court that heard the testimony and observed the witnesses at the suppression hearing."). Where facts are taken from elsewhere, they are cited.

[2] The person who called in the complaint to the Galesburg Police Department had reported that he heard one gunshot and then heard a woman yell "You are the worst piece of shit I've seen." However, this information was not conveyed to Phillips via the dispatch.

1

tracks was a silver 2014 Ford Fusion with Illinois plates and up-to-date registration stickers, driven, it turned out, by Coleman. Pieper tried to read the license plate number to run a search on it, but the train passed and the car started driving away before he could. Pieper followed the car, which parked in the driveway of a house just across the railroad crossing on the right. Pieper continued past the house and did a U-turn. He parked, got out of his squad car, and approached the parked car in the driveway. While this was happening, Pieper saw a person walk out of the garage and walk up to the side of the car and speak with the driver, who was the car's only occupant. By the time Pieper approached the car on foot, the person who had walked out of the garage had walked back to the garage.

Coleman got out of the car and looked as if he was going to walk toward the garage too. Pieper ordered Coleman to stop either two or three times. Coleman did not stop, and Pieper reached him, grabbed his arm, and told him to step back to the side of the car. Pieper stated that he was investigating an incident on Phillips Street. Pieper asked Coleman if he had been on Phillips Street. Coleman said no, and that he had no reason to be on Phillips Street. Pieper asked Coleman if he had any identification. Coleman said he did, and began patting his pocket and reaching into it, as if to retrieve his identification, and put the car keys he was holding into his pocket. Then he started to walk away. Pieper told him to stop; Coleman looked at him and took off running. Coleman ran across the front of the house, jumped a fence, and ran.

Another officer pursued Coleman, who was eventually caught and arrested. Pieper went back to the house and spoke with the occupant. This person professed ignorance as to Coleman's identity, and said that he did not know why the car was in the driveway. The Galesburg Police Department had the car towed. At some point, the Police Department ran the car's license plate number and found that it was registered to a Carlotta Weathers, of Chicago,

Illinois. In its briefing, the government states that a shell casing, handgun with two rounds missing and one in the chamber, cocaine, and ecstasy were recovered from the car, but presented no evidence to this effect. Resp. Mot. Suppress 2–3, ECF No. 14. The government also states that $5,150 in cash was found on Coleman's person.[3] *Id.* at 3. Specifically, no evidence was presented as to what contraband was actually seized, or, crucially, when, where, and by whom.

The police took Coleman to the Knox County Jail, where he was interviewed later the same day. During the interview, he made a number of incriminating statements.

On August 23, 2016, Coleman was charged by indictment with possession of cocaine with intent to distribute, possession of a firearm in furtherance of drug trafficking, being a felon in possession of a firearm, and a forfeiture count. ECF No. 1.

## DISCUSSION

Coleman seeks suppression of all items of physical evidence seized from the interior of the Ford Fusion, claiming that any such evidence was seized in violation of his Fourth Amendment rights, Mot. Suppress 1; and suppression of all statements, communications, admissions, or confessions he made in the interview, on the theory that such statements were made in violation of his Fifth Amendment rights, *id.* The government responds that Coleman has not met his burden of showing that he has standing to assert the Fourth Amendment claims, Resp. Mem. Supp. Mot. Suppress 3–6, ECF No. 17; that Pieper had probable cause to search the Ford Fusion, and that even if he did not, any evidence seized from the car is admissible under the doctrine of inevitable discovery, Resp. Mot. Suppress 3–6; and that none of Coleman's statements during his interview were sufficiently clear to invoke his rights under the Fifth Amendment, *id.* at 9–10, Resp. Mem. Supp. Mot. Suppress 6–10.

---

[3] This assertion is belied by the recording of Coleman's later interview at the Knox County Jail, where detectives stated to Coleman that they had recovered this amount of cash from the passenger side of the car.

## I. Suppression of Physical Evidence

When a warrantless search occurs, the government bears the burden of showing that the search was justified. *Arkansas v. Sanders*, 442 U.S. 753, 760 (1979) ("[T]he few situations in which a search may be conducted in the absence of a warrant have been carefully delineated and 'the burden is on those seeking the exemption to show the need for it.'" (quoting *United States v. Jeffers*, 342 U.S. 48, 51 (1951))).

However, when property is searched or seized, a defendant bears an initial burden of establishing that he has a right to challenge the government's search or seizure, either because he has a property interest in the "houses, papers [or] effects," U.S. Const. amend. IV, searched, or because he has both a subjective and an objectively reasonable expectation of privacy in the places or things searched.[4] *Rakas v. Illinois*, 439 U.S. 128, 148 (1978); *United States v. Walker*, 237 F.3d 845, 849 (7th Cir. 2001); *see United States v. Sanford*, 806 F.3d 954, 957 (7th Cir. 2015) ("We are mindful that the Supreme Court, in *Rakas* . . . said that it was better to ask whether a person asserting a Fourth Amendment right has a personal 'interest' that the search infringed than whether he has 'standing' to challenge the search."). To determine whether a subjective expectation exists, a court "looks 'to the individual['s] affirmative steps to conceal and keep private whatever item was the subject of the search.'" *United States v. Walton*, 763 F.3d 655, 658 (7th Cir. 2014) (quoting *United States v. Yang*, 478 F.3d 832, 835 (7th Cir. 2007)).

---

[4] The *Rakas* test arose from a situation in which passengers in a car they neither owned nor leased sought suppression of evidence seized when searching the car. *Rakas*, 439 U.S. at 140. The test is an extension of the principle, enunciated in *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring), that the Fourth Amendment protects not only property in which one has a possessory interest, but areas in which one has a reasonable expectation of privacy. One need not show such an expectation if one can establish a sufficient possessory interest. *See United States v. Jones*, 565 U.S. 400, 405 (2012). While after *Rakas*, some circuits applied an expectation-of-privacy test, and others a test focusing on whether a defendant has a possessory or property interest, *see Walker*, 237 F.3d at 849 (collecting cases), this was before *Jones* explained that mere physical intrusion on an individual's vehicle constituted a search. *Jones*, 565 U.S. at 404. Post-*Jones*, it is clear that either a showing of reasonable expectation of privacy, or of a possessory interest in searched property, is independently sufficient to support a defendant's motion to suppress evidence.

The objective test derives from the familiar teaching of *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring), that the individual's subjective expectation must also be one "that society is prepared to recognize as 'reasonable.'"

Coleman had a "quasi-property right" of some kind in the car, and he also had a reasonable expectation of privacy in the vehicle. Either circumstance is sufficient to give him a right to challenge the search of the car and seizure of its contents. Coleman avers, without contradiction from the government or any other reason to doubt it, that the car's owner, Weathers, lent it to him in mid-February 2016, apparently indefinitely. Coleman Aff. ¶ 3, ECF No. 16-1. Having had the long-term use of the vehicle probably gave him a property interest in the vehicle akin to that of a subtenant. *See Sanford*, 806 F.3d at 958 ("It can be argued that if you rent a limousine, or it's lent to you by a friend, you have a possessory interest in it even though you're not expected to drive it—indeed, even if you not only don't have a valid driver's license but have never learned to drive."). By the same token, Coleman sufficiently manifested his subjective expectation of privacy in the vehicle by his authorized use of the vehicle, and by driving it at the time of the incident. (The government's objection that the affidavit is self-serving is correct, as far as it goes, but simply because Coleman makes an assertion that serves his interests is not, standing alone, reason to doubt that assertion.) And the Court is persuaded that society is prepared to accept as reasonable a person's subjective expectation of privacy in a car borrowed for months on end from a friend. Without such an expectation, the very notion of "borrowing" would make little sense.[5][6]

---

[5] Most of the government's argument against suppression of the physical evidence in this case rests on the theory that once Coleman fled, he abandoned the car and any standing to challenge a search or seizure of its contents. The argument trades on a confusion between the sense of abandonment as literal leaving-behind or departure, and abandonment as relinquishment, by word or action, of property interests or expectations of privacy in property that society is prepared to recognize as reasonable. Abandonment in this latter, legally significant sense has been analyzed by a line of cases, typically dealing with left portable property, of which *United States v. Rem*, 984 F.2d 806, 810 (7th Cir. 1993), is the one that the government relies upon most heavily. *Rem*, quoting *United States v.*

Additionally, Coleman also likely has standing to challenge the search of the car because it was a consequence of the seizure of his person.

> We need not resolve Sanford's standing as a borrower and passenger because even if he lacks standing to challenge the search on the basis of having a quasi-property right of some sort in the car, he has standing to challenge the seizure of his person . . . when the car was stopped by the police. Therefore he has standing to challenge any search that resulted from his seizure if the seizure was unlawful.").

*Sanford*, 806 F.3d at 958–959. *See also United States v. Bueno*, 703 F.3d 1053, 1059 n.3 (7th Cir.), vacated in part on other grounds, *Gonzalez-Zavala v. United States*, 133 S. Ct. 2830 (2013). And, as Coleman argues in his motion, Pieper did seize him before the search of the car. Pieper grabbed Coleman by the arm as Coleman was walking away from the car, and told him to step back to the side of the car. This was a stop pursuant to *Terry v. Ohio*, 392 U.S. 1, 20 (1968), and accordingly, Pieper needed "a reasonable and articulable suspicion of wrongdoing" to make it. *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013); *see United States v. Packer*, 15 F.3d 654, 655–657 (7th Cir.1994) (holding that *Terry* stop occurs when "a reasonable person in [d]efendant's position would not feel free to leave."). Therefore, as in *Sanford*, Coleman has standing to challenge any search that resulted from the seizure of his person, if that seizure was unlawful.

---

*Jones*, 707 F.2d 1169, 1172 (10th Cir.), unsurprisingly frames the test for abandonment as turning on the objective reasonableness of asserting a privacy interest in the object in question. There is thus nothing unusual or distinct from the core suppression standing question about the inquiry whether one has abandoned property; the question in either case is whether, under the circumstances, it is reasonable to expect privacy in the property. *Rem*, 984 F.2d at 811. (*Rem*, a pre-*Jones* case, does not address the interesting question of whether one could relinquish an expectation of privacy in property but retain a possessory interest in it sufficient to challenge its search.) *Rem* is in any case distinguishable; Rem left a suitcase with eighteen kilograms of cocaine on a public luggage rack on an Amtrak train, and leapt from the train before it reached its destination, leaving the luggage behind. Leaving one's parked car is not akin to leaving luggage on a train.
[6] This case is distinguishable from the line of cases, including *United States v. Haywood*, 324 F.3d 514, 516 (7th Cir. 2003), in which defendants were sometimes found not to have had a reasonable expectation of privacy in rented vehicles when they lacked valid driving licenses. Here, as found above, Coleman had been authorized to drive the car by its registered owner.

6

To determine whether Pieper's initial seizure of Coleman was legal, the Court must determine whether Pieper had reasonable suspicion to make it. Although reasonable suspicion is a less demanding standard than the showing of probable cause that the government must make when a person is arrested, it still requires a minimal level of objective justification. *United States v. Sokolow*, 490 U.S. 1, 7 (1989). "In other words, reasonable suspicion is less than probable cause but more than a hunch." *United States v. Lawshea*, 461 F.3d 857, 859 (7th Cir. 2006) (citing United States v. Lenoir, 318 F.3d 725, 729 (7th Cir. 2003)). "Determining whether an officer had reasonable suspicion is assessed in light of the totality of the circumstances known to the officer and 'common-sensical judgments and inferences about human behavior.'" *United States v. Colbert*, No. 12 CR 603-1, 2013 WL 2477074, at *3 (N.D. Ill. June 10, 2013) (quoting *United States v. Oglesby*, 597 F.3d 891, 894 (7th Cir. 2010)).

All that Pieper knew when he seized Coleman was that a shots-fired dispatch had issued stating that a person involved, male, was driving a newer gold car nearby in Galesburg. Coleman's car did not match the description of the car's color, except perhaps insofar as it was metallic, and Pieper knew nothing else about the appearance of the male involved. Although the government suggested in its initial response to the motion to suppress that Coleman committed a traffic violation, no evidence was presented at the suppression hearing to support the claim. All Pieper knew as he walked up to Coleman and grabbed him by the arm was that a person in a different-colored car had been involved in possible criminal activity nearby, and that Coleman had pulled into a driveway shortly after Pieper stopped behind him at the train tracks. Pieper did not testify to anything else, other than possibly the time of night, that would support a reasonable officer's inference that a person getting out of their car on a private driveway had been involved in a nearby firearm discharge, or indeed, in any other illegal activity that would justify even a

brief stop. Reasonable suspicion does not require much, but it does require objective information that would support more than an officer's hunch. Such information is lacking here, and thus the seizure was unlawful.

"Evidence seized as a result of an illegal stop is the fruit of the poisonous tree and should not be introduced into evidence." *United States v. Wilbourn*, 799 F.3d 900, 910 (7th Cir. 2015); *see Wong Sun v. United States*, 371 U.S. 471, 484–86 (1963). Evidence is not automatically tainted if illegal police conduct is the but-for cause of the evidence having come to light; rather, there must be some "causal nexus" between the illegal police conduct and the seizure of the evidence. *United States v. Meece*, 580 F.3d 616, 619 (7th Cir. 2009). Here, it seems likely, as in the ordinary traffic stop case, that there is a close causal nexus between the illegal seizure and the contraband seized. However, certain basic evidence is missing about how the eventual search of the car was conducted, making it difficult to be certain. By whom was the contraband recovered? When? Pursuant to an inventory of the car made before towing, or as a result of a search undertaken on some other basis? If the latter, then what basis? What was the contraband? From what part of the car (or Coleman's person) recovered? While the government made representations in its briefing about many of these matters, they were not addressed by the evidence adduced at the hearing. It is the government's burden to show that the warrantless search of the car was supported by probable cause, and not the result of the illegal seizure. *Sanders*, 442 U.S. at 760. Without the kind of basic facts described above, the government cannot do so.

The government argues that even if the contents of the vehicle are otherwise subject to suppression, the doctrine of inevitable discovery should make the evidence admissible, because the police would have conducted an inventory search when they eventually towed the vehicle,

and found the contraband inside the car. Resp. Mot. Suppress 6. "The doctrine of inevitable discovery provides that illegally obtained evidence will not be excluded if the Government can prove, by a preponderance of the evidence, that the officers 'ultimately or inevitably would have . . . discovered [the challenged evidence] by lawful means.'" *United States v. Marrocco*, 578 F.3d 627, 637 (7th Cir. 2009) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). The government must make a two-part showing in order to invoke the doctrine: that it "had, or would have obtained, an independent, legal justification for conducting a search that would have led to the discovery of the evidence," *Marrocco*, 578 F.3d at 637–38, and that it "would have conducted a lawful search absent the challenged conduct," *id.* at 638. Here, the government makes neither showing. For, while it asserts in its response to the motion to suppress that Pieper saw the shell casing on the seat of the car through the window at some point, the government elicited no evidence to this effect. *See* Resp. Mot. Suppress 2. Thus, the government has not shown that simply by looking at the areas of the car in plain view, Pieper or another officer would have developed independent probable cause to search the vehicle. And while, after Coleman ran, the police might have had probable cause on that basis to search the vehicle, such probable cause would not be an *independent* legal justification for searching the vehicle—rather, it is also fruit of the poisonous tree. *Cf. United States v. Pittman*, 411 F.3d 813, 817 (7th Cir. 2005) (holding that, after a *lawful* traffic stop, probable cause to search vehicle existed after defendants fled from vehicle, and one was found to have a warrant). Even if the government could show that the police would have towed the car absent the challenged conduct, the government did not provide any kind of evidence about the Galesburg Police Department's policy regarding inventory searches of towed vehicles. *Cf. United States v. Richardson*, 121 F.3d 1051, 1054–55 (7th Cir. 1997) (analyzing the text of inventory policy to determine it

authorized the scope of an inventory search). Absent a showing of any sort about what sort of search the policy might mandate, it is impossible to tell whether the policy would have been followed under any circumstances, let alone these ones, and what it might have produced—particularly, again, in the absence of any evidence presented about where the contraband was located in Coleman's car, and how it was or might have been discovered.

## II. Suppression of Statements Made During Interrogation

Coleman argues that the evidence obtained in interrogation later at the Knox County Jail is the impermissible fruit on the antecedent illegal seizure of his person and property, Mot. Suppress 5, and additionally, that the statements he made during the interrogation were coerced in violation of the Fifth Amendment, because the interviewing detectives obtained no knowing and voluntary waiver of rights from Coleman before they began, and because Coleman invoked his right to remain silent, *id.* at 4–5. The government responds that Coleman's invocations were not sufficiently clear to assert his Fifth Amendment right against self-incrimination. Resp. Mot. Suppress 9–10.

Since Coleman and the contents of the Ford Fusion were seized in violation of the Fourth Amendment, the interview, less than twelve hours later, after Coleman had been taken to the jail and booked, but before he had been arraigned, is a fruit of the initial illegal search. *See Oregon v. Elstad*, 470 U.S. 298, 306, (1985) ("Where a Fourth Amendment violation 'taints' the confession, a finding of voluntariness for the purposes of the Fifth Amendment is merely a threshold requirement . . . the prosecution must show a sufficient break in events to undermine the inference that the confession was caused by the Fourth Amendment violation."); *Wong Sun*, 371 U.S. (holding Wong Sun's confession was not fruit of an illegal arrest because the arrest was

made six days earlier and during that time he had been free to move about and freely returned to the police station to make a statement).

## CONCLUSION

Accordingly, Coleman's motion to suppress, ECF No. 13, is GRANTED. A status hearing is set for April 27, 2017 at 9:30 a.m.


Entered this 18th day of April, 2017.

s/ Sara Darrow
SARA DARROW
UNITED STATES DISTRICT JUDGE
